## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

_____

|  |  |
|---|---|
| UNITED STATES OF AMERICA and ) | |
| PEOPLE OF THE VIRGIN ISLANDS, ) | |
| ) | |
| v.          ) | Criminal Action No. 2014-010 |
| ) | |
| ABDALLAH ABDALLAH,    ) | |
| ) | |
| Defendant.    ) | |

_____

**Attorneys:**
**Rhonda Williams-Henry, Esq.,**
St. Croix, U.S.V.I.
        *For the United States and the Virgin Islands*

**Omodare B. Jupiter, Esq.,**
St. Croix, U.S.V.I.
        *For the Defendant*

## MEMORANDUM OPINION

**Lewis, Chief Judge**

THIS MATTER is before the Court on Defendant Abdallah Abdallah's "Motion to Suppress Physical Evidence." (Dkt. No. 33). The Government opposes Defendant's Motion. (Dkt. No. 49). For the following reasons, the Court will grant in part and deny in part Defendant's Motion. Specifically, the Court will grant the Motion as it relates to the police officers' warrantless entry onto Defendant's property to seize the two cars, and will deny the Motion as it relates to the speed-loader with ammunition, car keys, and firearm.

## I.    BACKGROUND AND EVIDENCE

On March 19, 2014, Defendant Abdallah Abdallah was indicted in the District Court of the Virgin Islands on the following charges: Carjacking, in violation of 18 U.S.C. § 2119(1); Using a Firearm During a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii);

Robbery in the First Degree, in violation of 14 V.I.C. § 1862(2); Unauthorized Possession of a Firearm, in violation of 14 V.I.C. § 2253(a); Possession of Stolen Property, in violation of 14 V.I.C. § 2101(a); Unauthorized Possession of Ammunition, in violation of 14 V.I.C. § 2256(a); and Possession of Ammunition by a Felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Dkt. No. 1).

Pursuant to the Fourth Amendment of the United States Constitution, Abdallah seeks to suppress "all physical evidence that was obtained as a result of illegal searches and seizures," including a .38 speed-loader with live ammunition rounds, a 9mm firearm, the car used in the alleged hijacking, the allegedly hijacked car, and the sets of keys to each car. (Dkt. No. 33 at 1, 7, 10). At the evidentiary hearing, four witnesses testified: Virgin Islands Police Department ("VIPD") Officer Mitchell Guzman, Detective Corrine Smith, Detective Anthony Hector, and Officer Leon Cruz. The following facts emerge from the record established at the hearing. (Dkt. No. 79 (transcript of hearing)).[1]

At approximately 11:00 p.m. on December 24, 2013, Kayvon Vacher was driving his red Ford Focus through Estate Strawberry in St. Croix, Virgin Islands, when a Chevy Malibu cut in front of his car and blocked him. (Dkt. No. 79 at 6-8, 60). Vacher recognized the driver as Abdallah, whom he also knew by the nickname "Dollar." (*Id.* at 34, 58). Another individual, known by Vacher as "Sammy McDonald," got out of the front passenger seat, approached Vacher's car, pointed a gun at him, and ordered him out of the car. (*Id.* at 6-7, 34). McDonald told Vacher that he wanted Vacher's car and that he would get the car back the next day. (*Id.*).

---

[1] The Court bases the background factual discussion in this section on the record established at the suppression hearing. The Court provides this information solely for the purposes of this pretrial motion, ever mindful that Defendant Abdallah is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

McDonald also warned Vacher that if he notified the police about what happened, McDonald would kill him. (*Id.* at 7, 34). Vacher got out of the Ford Focus and McDonald got into it and drove away, with Abdallah following behind McDonald in the Malibu. (*Id.* at 34).

After determining that his car was not at Abdallah's house in Estate La Reine, Vacher reported the incident to Officer Mitchell Guzman at the Ann Schrader Command Police Station at approximately 12:53 a.m. on December 25. (*Id.* at 5, 34-35). Vacher identified the two carjackers by name—Sammy McDonald and Abdallah Abdallah—and provided physical descriptions. (*Id.* at 6, 10). Officer Guzman prepared a police report based on Vacher's report of the incident, including a description of the perpetrators,[2] and relayed the names of the suspects, a description of the Ford Focus, and Sammy's threat to the 911 emergency dispatcher. (*Id.* at 7, 12). The dispatcher released an all-points bulletin about the carjacking and suspects to patrol officers on duty. (*Id.* at 7). In addition, members of the VIPD arriving for duty on the morning of December 25 were briefed on the carjacking. (*Id.* at 44, 64).[3]

At approximately 12:42 p.m. on December 25, Vacher called 911 and reported that Abdallah was at Allyne's Variety Store in Estate Diamond. (*Id.* at 31, 65).[4] The resulting dispatch indicated that the morning's carjacking victim had called, and described the suspect as a slim, light-skinned individual of Arab descent, wearing black pants, a black shirt, and a black hoodie. (*Id.* at 31, 65).

---

[2] Officer Guzman's report describes Abdallah as a slim, white foreigner, wearing black pants and a black shirt, with brown eyes, a mustache, and long, black, curly hair. (*See* Def. Exh. 1).

[3] Detective Hector testified that, generally, the briefing summarizes "what happened, and who was involved, the suspect, [and] the victims." (Dkt. No. 79 at 79).

[4] Detective Hector, who answered the dispatch, testified that the 911 transmission stated that the victim had passed by Allyne's Variety Store and then called. (Dkt. No. 79 at 91). In a later conversation, Vacher told Detective Corrine Smith that it was actually a friend who had seen Abdallah and alerted Vacher that Abdallah was at Allyne's. (*Id.* at 43).

3

Detective Hector, an 18-year veteran of the VIPD, answered the dispatch. (*Id.* at 63, 65). As he approached Allyne's Variety Store by car, Detective Hector observed a man—whom he identified in the courtroom as Defendant Abdallah—fitting the description in the dispatch and standing in front of the store. (*Id.* at 67, 70-71). After making eye contact with Detective Hector, the man quickly went around the corner of the store. (*Id.*). Because the individual fit the 911 dispatch's description of the carjacking suspect, Detective Hector followed him on foot to the back of the store and stopped him. (*Id.* at 70-71, 77).

Based on his knowledge from the briefing that morning that the carjackers used a gun, Detective Hector conducted a patdown of the suspect for safety reasons. (*Id.* at 70). In the suspect's left pants pocket, he recognized an object as a speed-loader with ammunition and removed it. (*Id.* at 71). After the suspect began to resist further searching, Detective Hector handcuffed him and continued the patdown, believing that he could have a gun in addition to the ammunition. (*Id.* at 71-72). Detective Hector felt a hard object in the suspect's right pants pocket, recognized the object as keys, and removed what turned out to be two sets of keys, which he kept because he believed they could be used as a weapon against him. (*Id.* at 72). Detective Hector noticed that one of the keys was to a Ford vehicle, which he knew had been taken during the carjacking based on that morning's briefing. (*Id.*). He then called a backup unit to assist with a search for a gun that he believed the suspect had hidden behind the store and to bring Vacher to identify the suspect. (*Id.* at 72-73).

When Vacher arrived at Allyne's Variety Store, he identified the suspect as Abdallah—one of the carjackers—and one set of car keys as his own. (*Id.* at 74). The police arrested Abdallah and transported him to a police station. (*Id.* at 74, 76). Forensics subsequently found a

gun behind Allyne's Variety Store. (*Id.* at 75). Vacher spoke with Detective Corrine Smith and provided additional details about the events surrounding the carjacking. (*Id.* at 30, 33-36).

Vacher then led Detective Smith and at least five other law enforcement officers to Abdallah's residence in Estate La Reine, where Detective Smith intended to collect information for a search warrant. (*Id.* at 41-42). Vacher identified a Chevy Malibu parked in front of Abdallah's house as the vehicle that cut him off during the carjacking. (*Id.* at 60). Officer Leon Cruz drove onto the property adjacent to Abdallah's lot to speak to a resident who was outside. (*Id.* at 97). While speaking with the neighbor, Officer Cruz observed a red Ford Focus parked behind Abdallah's house. (*Id.* at 98, 105-06). VIPD forensics entered Abdallah's property and towed the red Ford Focus. (*Id.* at 149).

## II.   DISCUSSION

### A.   *Terry* Stop by Detective Hector

Abdallah argues that Detective Hector lacked reasonable suspicion to justify a *Terry* investigatory stop because the police report resulting from Vacher's in-person report and the subsequent 911 tip lacked credibility and reliability. The Court disagrees and finds that Detective Hector had the requisite reasonable suspicion to support the seizure of Abdallah.

### 1.   Applicable Legal Standards

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. CONST. amend. IV. "[S]earches without a warrant are presumptively unreasonable." *United States v. Mathurin*, 561 F.3d 170, 173 (3d Cir. 2009). Where an individual challenges a warrantless search, the Government has the burden to "demonstrate that the warrantless search was conducted pursuant to one of the exceptions to the warrant requirement." *United States v. Williams*, 2014 WL 252101, at *2 (D.N.J. Jan. 23, 2014) (citing *United States v. Herrold*, 962 F.2d 1131, 1137 (3d Cir. 1992)). Generally, any evidence obtained as a result of an

5

unconstitutional search or seizure "must be suppressed as 'fruit of the poisonous tree.'" *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006) (quoting *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963)).

"[U]nder the exception to the warrant requirement established in *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court has held that 'police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause.'" *Mathurin,* 561 F.3d at 173-74 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).[5] Such brief investigative stops are "seizures" subject to Fourth Amendment protection. *Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003) (citing *Terry*, 392 U.S. at 21). The constitutionality of a *Terry* stop involves a two-part assessment:

> First, we examine 'whether the officer's action was justified at its inception'—
> that is, whether the stop was supported by reasonable suspicion at the outset. . . .
> Next, we determine whether the manner in which the stop was conducted 'was
> reasonably related in scope to the circumstances which justified the interference
> in the first place.'

*United States v. Johnson*, 592 F.3d 442, 452 (3d Cir. 2010) (quoting *Terry*, 392 U.S. at 19-20).

Reasonable suspicion "is a less demanding standard than probable cause." *Alabama v. White,* 496 U.S. 325, 330 (1990). Because "probable cause means 'a fair probability that contraband or evidence of a crime will be found,' the level of suspicion necessary to justify a *Terry* stop is somewhat lower and can be established with information that is different in quantity or content from that required for probable cause." *United States v. Ramos*, 443 F.3d 304,

---

[5] Contrary to Defendant's assertion at the suppression hearing, the suspected criminal activity need not be in process. Police may use a "*Terry* stop" to investigate reasonable suspicion that an individual "was involved in or is wanted in connection with a completed felony." *United States v. Hensley*, 469 U.S. 221, 227-28 (1985); *accord Brown*, 448 F.3d at 244 n.7 ("The *Terry* analysis applies here even though the crime in question had already been completed.").

308 (3d Cir. 2006) (quoting *White*, 496 U.S. at 330). The police officer must, however, demonstrate that the stop was based on something more than an '"inchoate and unparticularized suspicion or hunch.'" *Sokolow,* 490 U.S. at 7 (quoting *Terry,* 392 U.S. at 27). "Reasonable suspicion is an 'elusive concept,' but it unequivocally means that 'the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Brown*, 448 F.3d at 246 (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). In evaluating reasonable suspicion, courts "must consider 'the totality of the circumstances—the whole picture.'" *Sokolow,* 490 U.S. at 8 (quoting *Cortez*, 449 U.S. at 417).

### 2.     Analysis

In reaching the conclusion that a justifiable *Terry* stop occurred, the Court analyzes the facts known to Detective Hector before he stopped Abdallah. *Florida v. J.L.*, 529 U.S. 266, 271 (2000). Detective Hector knew about the carjacking at gunpoint that had occurred the night before, based on the morning briefing which resulted from Vacher's in-person report to Officer Guzman. (Dkt. No. 79 at 45, 64-65). In addition, a radio dispatch informed Detective Hector that the victim had alerted 911 of a suspect's presence at Allyne's Variety Store and provided a description of the suspect's ethnicity, skin color, build, and clothing. (*Id.* at 31, 65, 83). Finally, Detective Hector observed a man fitting the description of the suspect, as described in the radio dispatch, at Allyne's Variety Store. (*Id.* at 67, 70, 77). Although Detective Hector testified that he stopped Abdallah because he fit the 911 dispatch description, (*see id.* at 77, 93), the Court includes all facts available to Detective Hector in its analysis of whether "a reasonable, trained officer standing in [Detective Hector's] shoes could articulate specific reasons justifying" the investigative stop of Abdallah. *See Brown*, 448 F.3d at 247 ("[E]ven if the initial radio broadcast and the conduct of [the defendants] did not factor into [the police officer's] reasonable suspicion

analysis, they must be included in ours."). Moreover, the Court considers these facts in the totality. *Sokolow,* 490 U.S. at 7.

A police report will generally provide reasonable suspicion "when the victim of a street crime seeks immediate police aid and gives a description of his assailant." *See Adams v. Williams*, 407 U.S. 143, 147 (1972). Such was the case here, where Vacher reported the alleged carjacking at a VIPD station two hours after it occurred, provided physical descriptions of the perpetrators—whom he knew—and identified them by name. (Dkt. No. 79 at 5-6, 10; Def. Exh. 1). The Court thus finds that this in-person report by the victim describing perpetrators whom he knew and the resulting police report were both credible and reliable.[6]

The Court further finds that the December 25 briefing derived from Vacher's in-person report, together with the tip as to the suspect's whereabouts, was sufficient to provide reasonable suspicion to justify Abdallah's seizure. Detective Hector had the benefit of the briefing that he received on the morning of December 25, including details about the incident, suspects, and victim. (*Id.* at 44, 64, 79). Thus, prior to receiving the tip as to the suspect's location, Detective Hector already had reliable information stemming from an in-person police report from a victim that a particular individual—known to and identified by the victim—was involved in criminal activity.

---

[6] At the suppression hearing, Defendant argued that the police report by Officer Guzman (*see* Def. Exh. 1) lacked credibility because it contained Abdallah and McDonald's full names, while Detective Smith, who spoke to Vacher in the afternoon of December 25, testified that Vacher could only provide the suspects' nicknames. (*See* Dkt. No. 79 at 124-28). Detective Hector testified that the December 25 morning briefing included the suspects' names, although he could not recall whether Abdallah's full name was given. (*Id.* at 78, 81). Irrespective of whether Vacher provided full names or nicknames at various times, the Court is not persuaded that this fact adversely affected the credibility of either Vacher's in-person report or Officer Guzman's police report. Indeed, it is undisputed that the full names and nicknames refer to the same person and that Vacher knew Abdallah and recognized him.

The tip regarding the location of the suspect, which was conveyed by—albeit not based on the personal observation of—the victim, matched the description of a suspect previously reported by and known to the victim. The Court finds that the reliability of the tip from Vacher's friend was enhanced because the tip was passed through Vacher, whose status as the victim, together with his recognition of and familiarity with the perpetrators, armed him with unique personal knowledge about the perpetrators' appearances and identities. *See Brown*, 448 F.3d at 250 (stating that reasonable suspicion may be supported by "information from sources that— while unknown to the police—prove by accuracy and intimacy of the information provided to be reliable at least as to the details contained within that tip") (internal quotation and citation omitted). In addition, Vacher identified himself on the phone to 911, allowing the VIPD to hold him responsible for providing any false or inaccurate information. *See id.* at 250 (identifying as a factor indicating reliability that "[t]he person providing the tip can be held responsible if her allegations turn out to be fabricated"); *United States v. Valentine*, 232 F.3d 350, 354 (3d Cir. 2000) (explaining that an informant's knowledge "that the officers could quickly confirm or disconfirm the tip" and "had some opportunity to find the informant if the tip did not pan out" supported the reliability of the tip).

Further, according to Detective Hector, Abdallah was the only individual at Allyne's Variety Store who matched the description provided by the tip. (Dkt. No. 79 at 65, 92); *see United States v. Goodrich*, 450 F.3d 552, 560-61 (3d Cir. 2006) ("'To suffice, the description must permit the police to be reasonably selective in determining who to stop for investigation, and whether this may be said to be the case will depend upon how much persons are in the universe of potential suspects.'") (quoting 6 WAYNE R. LAFAVE, SEARCH AND SEIZE: A TREATISE ON THE FOURTH AMENDMENT, § 9.5(g) (4th ed. 2004)). Moreover, Detective Hector testified that

Abdallah quickly walked away when the detective made eye contact. (Dkt. No. 79 at 67, 70-71). "[F]light upon noticing police" can contribute to an officer's reasonable suspicion. *See United States v. Navedo*, 694 F.3d 463, 472 (3d Cir. 2012); *Brown*, 448 F.3d at 251 (identifying "nervous, evasive behavior" as a factor that "serve[s] to corroborate an otherwise insufficient tip"); *see United States v. Garvin*, 548 F. App'x 757, 758, 760 (3d Cir. 2013) (finding reasonable suspicion for police officers to stop a man matching the description given by a radio flash, which provided no information about the source of the tip, based on police officers' experience, defendant's abrupt change of direction upon seeing a marked police vehicle, and defendant's attempt to enter someone else's home upon being approached by officers).

Based on the totality of the circumstances here, the Court concludes that the "whole picture" in this case demonstrates that Detective Hector had reasonable suspicion sufficient to justify the seizure of Abdallah as one of the suspected carjackers.[7] Accordingly, Abdallah's seizure did not violate the Fourth Amendment.

**B.     *Terry* Frisk by Detective Hector**

Abdallah next argues that the speed-loader with live ammunition and keys found on his person by Detective Hector, as well as the firearm recovered nearby, should be suppressed because Detective Hector's search violated his Fourth Amendment rights. As discussed below, Abdallah's arguments will be rejected.

---

[7] In his Motion to Suppress, Defendant relies on *United States v. Brown*, 448 F.3d 239 (3d Cir. 2006), to support the proposition that reasonable suspicion was lacking here. The facts of *Brown*, however, are inapposite. There, the Third Circuit found reasonable suspicion lacking because, unlike in this case, the tip upon which the police relied consisted of an excessively vague description of the suspects—which was also partially incorrect and inaccurate as to noteworthy physical characteristics. Moreover, in *Brown*, neither the victim nor the tipster personally knew the perpetrators by appearance or name. *See id.* Thus, the circumstances here are distinguishable.

1.      **Applicable Legal Standards**

"[T]he realities of law enforcement" which allow police officers to briefly detain an individual for a *Terry* investigative stop also permit officers to "perform a limited protective 'patdown' for weapons during that detention." *Navedo*, 694 F.3d at 467 (quoting *Terry,* 392 U.S. at 30). A protective search or patdown is permissible if the officer has reasonable suspicion to believe that a suspect is "armed and dangerous." *Id.* (quoting *Terry*, 392 U.S. at 30). "The purpose of a *Terry* frisk for weapons 'is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence.'" *United States Gatlin,* 613 F.3d 374, 378 (3d Cir. 2010) (quoting *Adams,* 407 U.S. at 146). The issue "is whether a reasonably prudent [person] in the circumstances would be warranted in the belief that his safety or that of others [is] in danger." *Terry*, 392 U.S. at 27. That determination is based on the totality of the circumstances, recognizing that an officer may have more experience and training "to make inferences from and deductions about the cumulative information available" than an untrained person. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

While a police officer may perform a protective patdown for weapons during a *Terry* stop, the scope of that search must be "carefully limited [to] the outer clothing of such persons in an attempt to discover weapons which might be used to assault" the officer. *Terry*, 392 U.S. at 30. "If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993). As "[t]he sole justification of the search in [a *Terry* stop] is the protection of the police officer," any removal of items from a suspect is strictly limited to "guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry*, 392 U.S. at 29. Thus, a court must assess whether an officer's seizure of an object, based on his belief that it

11

constitutes a weapon, is objectively reasonable. *Id.* at 21-22 (legality of *Terry* encounter depends on whether "the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action was appropriate") (internal quotation and citation omitted).

### 2. Analysis

In view of the police briefing that the carjacking occurred at gunpoint and Abdallah's match to the radio dispatch's description, Detective Hector had not only reasonable suspicion to stop Abdallah, but also a reasonable belief that he was "dealing with an armed and dangerous individual." *See Terry*, 392 U.S. at 27. Detective Hector was therefore justified in conducting "a reasonable search for weapons." *See id.*

Detective Hector testified that in conducting the patdown of Abdallah, he immediately recognized the speed-loader through the material of Abdallah's pants based on his personal experience with firearms. (Dkt. No. 79 at 71, 88-89). His seizure of the speed-loader with ammunition was reasonable because, at the time of the seizure, he did not know if Abdallah also possessed a firearm to which the speed-loader could be attached and possibly fired. *See United States v. Gardner*, 2013 WL 5918313, at *9-10 (W.D. Pa. Nov. 1, 2013) (citing *United States v. Jackson*, 179 F. App'x 921, 931 (6th Cir. 2006)) (stating that officer's "removal of the ammunition pouch, before he had completed the frisk to exclude the possibility that [the defendant] had a gun on him, was reasonable"); *see also United States v. Goode*, 486 F. App'x 261, 264 (3d Cir. 2012) (noting that officer permissibly relied on personal experience to identify the object in defendant's pocket). Thus, Detective Hector's seizure of the speed-loader with ammunition did not violate the Fourth Amendment.

In addition, after removing the speed-loader, Detective Hector properly continued to frisk Abdallah to determine if he was also carrying a firearm with which the speed-loader could be used. *See Gardner*, 2013 WL 5918313, at *12. During Detective Hector's continued patdown for a gun, he recognized objects in Abdallah's pockets to be keys. (Dkt. No. 79 at 72, 91). He removed the keys because he believed that Abdallah could either stab him or "chuck" him with the keys. (*Id.*). The legality of a *Terry* frisk, however, is based on an objective reasonableness test. *Terry*, 392 U.S. at 21-22; s*ee Goodrich*, 450 F.3d at 559 ("[T]he subjective motive or intent [of the officer] is not relevant for *Terry* purposes.").

Although some courts have found that keys can be considered weapons, this Court, consistent with its prior ruling and along with some other jurisdictions, concludes that Detective Hector's seizure of the keys was unreasonable and exceeded the scope of a *Terry* frisk. *See United States v. Holmes*, 505 F.3d 1288, 1292 (D.C. Cir. 2007) (holding that seizure of keys was beyond limited *Terry* scope because keys are not weapons); *United States v. Wrensford*, 2014 WL 3907021, at *10 (D.V.I. Aug. 11, 2014) (suppressing keys seized during *Terry* frisk because keys are not weapons); *United States v. Alexander*, 2008 WL 2714076, at *13 (M.D. Tenn. July 9, 2008) (concluding that seizure of key transformed *Terry* frisk into an objectively unreasonable search).

In *Terry*, the Supreme Court emphasized that the interest served by a *Terry* frisk is "to assure [the police officer] that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." 392 U.S. at 23. The Court finds that the two sets of keys—which Detective Hector admittedly knew were keys—fall outside the "strictly limited" scope and purpose of a *Terry* frisk to protect against "guns, knives, clubs, or other hidden instruments [of] assault." *Id.* at 29. To permit an officer to seize any object based on a

13

fear that it could be turned into a weapon "would swallow the rule that only a limited weapons patdown is permissible with a *Terry* stop." *Wrensford*, 2014 WL 3907021, at *10. Accordingly, Detective Hector's his seizure of the keys contravened the Fourth Amendment.

Generally, evidence obtained as a result of a violation of a defendant's constitutional rights will be suppressed as "fruit of the poisonous tree." *United States v. Williams*, 413 F.3d 347, 352 (3d Cir. 2005) (citing *Wong Sun*, 371 U.S. at 488). The Government argues, however, that, even if the keys could not be seized pursuant to a *Terry* frisk, they should not be suppressed because of the inevitable discovery doctrine. (Dkt. No. 79 at 117).

The doctrine of inevitable discovery applies "'if the prosecution can establish by a preponderance of the evidence that the [evidence] ultimately or inevitably would have been discovered by lawful means.'" *United States v. Stabile*, 633 F.3d 219, 245 (3d Cir. 2011) (quoting *United States v. Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir. 1998)). "The Government can meet its burden by establishing 'that the police, following routine procedures, would inevitably have uncovered the evidence.'" *Id.* (quoting *Vasquez*, 149 F.3d at 195). In other words, the Government must show that "the evidence would have been obtained inevitably, and therefore would have been admitted regardless of any overreaching by the police." *Nix v. Williams*, 467 U.S. 431, 444 (1984); *see Wrensford*, 2014 WL 3907021, at *11 (concluding that the inevitable discovery doctrine could be used to cure the illegality of an officer's seizure of non-weapon items during *Terry* frisk).

Here, the Government has met its burden of establishing that the keys would have been inevitably discovered. Abdallah was lawfully arrested following his seizure based on his identification by Vacher as one of the perpetrators, which established the necessary probable

cause.[8] Detective Hector testified that it was routine police procedure to search a person incident to his arrest or when the police are transporting an individual to the police station. (Dkt. No. 79 at 75). Detective Smith also testified that it was routine procedure for police to conduct an additional patdown of a person following his arrest and before placing him in a police vehicle. (*Id.* at 41). Thus, Abdallah would have been searched incident to his lawful arrest—at which time the keys would have been discovered. Accordingly, notwithstanding that the keys were not properly seized pursuant to the *Terry* stop, they would have been discovered in a search incident to Abdallah's lawful arrest. The Court will, therefore, deny Defendant's request to suppress the keys.

Finally, Defendant argues that the firearm which was recovered following a search of the area where he was stopped and subsequently arrest should be suppressed. (Dkt. No. 33 at 7, 9). Given that the Court has found that Abdallah was lawfully stopped and arrested, there is no basis for excluding the firearm which was recovered in the process.

In view of the foregoing, the Court will not suppress the speed-loader with ammunition, the keys, or the firearm.

---

[8] In his Motion to Suppress, Defendant argues that the police lacked probable cause to arrest him because Vacher did not "give the police any facts regarding" Abdallah's criminal conduct. (Dkt. No. 33 at 5-7). The Court disagrees. Vacher described Abdallah's role as an active participant in the carjacking, including driving the Chevy Malibu that blocked Vacher's car; acting as a lookout while McDonald threatened Vacher at gunpoint; and following McDonald after the successful carjacking. (Dkt. No. 79 at 6-8, 34, 58, 60). Abdallah was arrested following an in-person identification by Vacher. (*Id.* at 74). Therefore, the Court concludes that the police had probable cause to believe that Abdallah was one of the carjackers. *See Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 788 (3d Cir. 2000) ("'Probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested.'") (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)); *see also id.* at 789 ("If 'at the moment the arrest was made . . . the facts and circumstances within [a police officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that [a person] had violated the law, probable cause is present.") (quoting *Hunter v. Bryant*, 502 U.S. 224, 228 (1991)).

**C.      Seizure of Vehicles From Defendant Abdallah's Property**

Abdallah contends that the police executed unreasonable searches and seizures when they entered his property and seized the Chevy Malibu from his front yard and the red Ford Focus from behind his house. The Government asserts: (1) that the cars were not within the curtilage; (2) that Abdallah did not have a legitimate expectation of privacy in the cars because they were visible to the public; and (3) that the police properly seized the cars because they were in plain view.[9] The Court finds that the cars were in the curtilage of Abdallah's home and that the police violated his Fourth Amendment protections when they entered the curtilage and seized the cars without a warrant.

**1.      Applicable Legal Standards**

Warrantless searches and seizures within a home are presumptively unreasonable and therefore violate the Fourth Amendment, unless one of the defined exceptions to the warrant requirement applies. *See, e.g.*, *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011); *United States v. Mundy*, 621 F.3d 283, 287 (3d Cir. 2010). Courts "regard the area 'immediately surrounding and associated with the home'—what [] cases call curtilage—as part of the home itself for Fourth Amendment purposes." *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013) (quoting *Oliver v. United States*, 466 U.S. 170, 176 (1984)). Courts may consider several factors when determining whether a particular area owned by an individual falls within his home's curtilage or is an "open

---

[9] At the suppression hearing, the Government appeared to concede that at least Vacher's Ford Focus, which was located behind Abdallah's house, was within the home's curtilage. (*See* Dkt. No. 79 at 147) ("I don't dispute that [the Ford Focus was] in the curtilage of the property, . . . but [Abdallah] has not shown that this area that he has exposed to public view is so intimately tied to the house that he has a Fourth Amendment protection in where the stolen vehicle is." However, as discussed below, the definition of curtilage is an area "so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013). Therefore, the distinction that the Government is attempting to make is meritless.

field" not entitled to Fourth Amendment protections. *See United States v. Dunn*, 480 U.S. 294, 301 (1987). These include: (1) the proximity of the area at issue to the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the area from observation. *See id.* The factors, however, are "useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.*

The "plain view" doctrine permits the warrantless seizure by police of private possessions where three requirements are satisfied. *Horton v. California*, 496 U.S. 128, 141 (1990). First, the officer must be lawfully in the place "from which the evidence could be plainly viewed." *Id.* at 136. Second, the officer must have a "lawful right of access to the object itself." *Id.* at 137. Third, the incriminating nature of the object must be "immediately apparent." *Id.* at 136; *see Stabile*, 633 F.3d at 240 (citing *United States v. Menon*, 24 F.3d 550, 559-60 (3d Cir. 1994) (recognizing *Horton*'s three-part test)).

### 2. Analysis

The Court agrees with Abdallah that the VIPD officers seized the Chevy Malibu and Ford Focus from within the curtilage of his home. The seized Malibu was parked a few feet in front of the steps to Abdallah's home. (*See* Gov. Exh. 1-5 (photographs)). The seized Ford Focus was parked even closer to Abdallah's house in his back yard. (*See* Gov. Exh. 9-10 (photographs)). The Court recognizes that Abdallah's property was not enclosed or blocked from public view. However, the cars were located in areas extremely close to Abdallah's home, rather than toward the edge of his property, which strongly favors a finding that these areas constitute curtilage. *See*

17

*California v. Ciraolo*, 476 U.S. 207, 213 (1986) (curtilage is the "area around the home" that is

"intimately linked to the home, both *physically* and psychologically") (emphasis added); *United*

*States v. Bansal*, 663 F.3d 634, 663 (3d Cir. 2011) ("It is axiomatic that '[a] person's curtilage is

the area *immediately adjacent* to his home in which he has a legitimate expectation of privacy.'")

(quoting *Estate of Smith v. Marasco*, 430 F.3d 140, 156 n.14 (3d Cir. 2005)) (emphasis added).

Here, the Court concludes that Abdallah had a reasonable expectation of privacy in the few feet

immediately surrounding his house such that it "should be placed under the home's 'umbrella' of

Fourth Amendment protection." *Dunn*, 480 U.S. at 301.[10]

Where property falls within the curtilage of an individual's home, the government's

warrantless entry into that curtilage requires both probable cause and exigent circumstances.

*United States v. Coles*, 437 F.3d 361, 365 (3d Cir. 2006).[11] Here, the officers had probable cause

to believe that the Ford Focus at the rear of Abdallah's home was stolen property, and therefore

evidence of a crime, because Vacher had identified Abdallah as a carjacker, and the Chevy

---

[10] In its briefing and oral argument, the Government relied on *United States v. Shroyer*, 1998 WL 1585819 (S.D. Ohio May 27, 1998), as an analogous case. (Dkt. No. 49 at 10; Dkt. No. 79 at 122-23). There, the court found that the defendant "had failed to prove that the area along the [inside of his] picket fence at the rear of his backyard was so intimately tied to his house" that it was entitled to Fourth Amendment protection as curtilage. *Shroyer*, 1998 WL 1585819, at *7. That case, however, lacked evidence regarding the proximity of the area in question to the defendant's house, and involved a location, albeit inside a fence, that was "at the rear of his backyard" in close proximity to "fields, cornfields, and woods." *Id.* Here, the areas in question were within mere feet of Abdallah's home. Therefore, in addition to not being controlling authority, *Shroyer* is distinguishable.

[11] The Court notes that the officers' observations of the cars did not offend the Fourth Amendment. The officers lawfully viewed the Chevy Malibu from a public road. (Dkt. No. 79 at 38-39); *see Ciraolo*, 476 U.S. at 213 ("The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares."). Further, Officer Cruz did not enter Abdallah's property to observe the red Ford Focus at the rear of the house. (Dkt. No. 79 at 104-06); *see United States v. Chun Yen Chiu*, 857 F. Supp. 353, 359 (D.N.J. 1993) ("As a general rule, it is not unlawful for officers outside the curtilage to observe what occurs thereon.").

Malibu parked outside of Abdallah's home as the car used in the carjacking. (Dkt. No. 79 at 59-60, 74); *see Florida v. White*, 526 U.S. 559, 565 (1999) (upholding seizure of car from public place where police had probable cause to believe that car itself was contraband under state law); *see also* 14 V.I.C. § 2101(a) (criminalizing the possession of property unlawfully obtained).

Exigent circumstances include the possibility that evidence may be removed and destroyed. *Coles*, 437 F.3d at 366. The "ready mobility" of cars is commonly recognized as exigent circumstances justifying their warrantless seizure based only on probable cause. *See, e.g.*, *Maryland v. Dyson*, 527 U.S. 465, 466-67 (1999); *United States v. Stubbs*, 281 F.3d 109, 122 (3d Cir. 2002). However, "[t]he 'exigent circumstances' exception is not a per se rule to be applied indiscriminately to every automobile . . . , nor should it be applied to every object that has the capacity for movement." *United States v. Valen*, 479 F.2d 467, 470 (3d Cir. 1973). "Rather, its application should depend upon an evaluation of attendant circumstances." *Id.*; *see United States v. Menke*, 468 F.2d 20, 23 (3d Cir. 1972) (stating that exigent circumstances is a matter to be determined by the "reality of the circumstances" in each particular case).

The facts of this case lead the Court to conclude that no exigent circumstances justified the police's warrantless seizure of the vehicles. At the time of the seizures, Abdallah was in police custody, (Dkt. No. 79 at 74, 76), and the police had seized the sets of keys to both cars, (*id.* at 72). Under the circumstances here, these facts significantly lower the risk of removal that is generally inherent in the "ready mobility" of cars. Moreover, at least six officers were present at Abdallah's house, (*id.* at 41-42), making it possible, and reasonable, for some officers to remain while others sought a search warrant. Because exigent circumstances did not exist to justify the warrantless entry onto the curtilage of Abdallah's property to seize the cars, the Court

concludes that the police seized the Chevy Malibu and the Ford Focus in violation of Abdallah's Fourth Amendment rights. *See Coles*, 437 F.3d at 366.

In so holding, the Court rejects the Government's argument that because the cars were in plain view on Abdallah's property, the police's seizure was reasonable. (*See* Dkt. No. 49 at 9; Dkt. No. 79 at 117-23). As the U.S. Supreme Court has noted,

> It is important to distinguish "plain view" . . . to justify *seizure* of an object, from an officer's mere observation of an item left in plain view. Whereas the latter generally involves no Fourth Amendment search . . . , the former generally does implicate the Amendment's limitations upon seizures of personal property. The information obtained as a result of observation of an object in plain sight may be the basis for probable cause or reasonable suspicion of illegal activity. In turn, these levels of suspicion may, in some cases, . . . justify police conduct affording them access to a particular item.

*Texas v. Brown*, 460 U.S. 730, 739 n.4 (1983) (plurality opinion) (internal citations omitted); *see also United States v. Telfair*, 507 F. App'x 164, 172 (3d Cir. 2012), *cert. denied* 134 S. Ct. 167 (2013) ("[T]he lawful access requirement [of the plain view doctrine] is intended to clarify that police may not enter a premises to make a warrantless seizure, even if they could otherwise see (from a lawful vantage point) that there was contraband in sight.") (quoting *United States v. Davis*, 690 F.3d 226, 234 (4th Cir. 2012)). Thus, "'[t]he "plain view" doctrine . . . is best understood not as an independent exception to the warrant clause, but simply as an extension of whatever the prior justification for an officer's access to an object may be.'" *Yamba*, 506 F.3d at 257 (quoting *Texas* 460 U.S. at 738-39).

Here, there is no prior justification or otherwise lawful basis for the officers' warrantless entry into the curtilage of Abdallah's home for seizure of items therein—even items such as the allegedly stolen Ford Focus. *See United States v. Jenkins*, 124 F.3d 768, 774 (6th Cir. 1997) (holding that where an officer views evidence within protected curtilage from a permissible vantage point, the plain view doctrine does not apply to allow him to enter the curtilage and seize

20

the items); *G&G Jewelry, Inc. v. City of Oakland*, 989 F.2d 1093, 1101 (9th Cir. 1993) ("[E]ven though contraband plainly can be seen and identified from outside the premises, a warrantless entry into those premises to seize the contraband would not be justified."); *United States v. Naugle*, 997 F.2d 819, 823 (10th Cir.), *cert. denied*, 510 U.S. 997 (1993) ("[I]n situations such as when an officer on the street sees an object through the window of a house, or when officers make observations via aerial photograph or long-range surveillance[,] . . . the officers cannot use the plain view doctrine to justify a warrantless seizure, because to do so would require a warrantless entry upon private premises."); *United States v. Whaley*, 781 F.2d 417, 419 (5th Cir. 1986) ("[T]he mere observation of [marijuana plants] from the road or driveway would not justify entry into the home or curtilage to search or seize property found there. That would have given probable cause to support a warrant."). While the Court is mindful that officers need not "shield their eyes" when observing items within the curtilage of a home, *Ciraolo*, 476 U.S. at 213, such observations do not permit—except in narrow circumstances not present here—warrantless entry onto the property to seize the evidence.

## III.   CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendant's Motion to Suppress (Dkt. No. 33). An appropriate Order accompanies this Memorandum Opinion.

Date:   January 26, 2015                    _____/s/_____
                                            WILMA A. LEWIS
                                            Chief Judge